Here first from Mr. Daniel Wade. Mr. Wade, may I proceed? Yes, sir. Thank you, Your Honors. Your Honor, in today's case, essentially what we're asking the court to do is set a bright line rule in cases such as this involving sexual harassment by residents in a nursing home towards the employees. There's really three issues, though, that we're going to address as we go forward here. One is whether or not the instances or the facts that's complained of by Ms. Gardner arose to the level that would impose liability on the nursing home for the actions of J.S., the resident. Secondly, another issue is whether or not Ms. Gardner presented direct evidence of retaliation or discrimination for her complaints about the harassment when she refused to work in the hostile environment. And the third is whether or not Brandi Gregg, the director of nursing for the nursing home, was able to provide competent summary judgment evidence regarding the grounds for Ms. Gardner's ultimate termination. In regards to whether or not the environment was hostile, obviously there's a couple of cases which have been decided by this court. One was Cain v. Blackwell. The other was EEOC v. Nexion, which Nexion was an unreported case. But nonetheless, those are the only two that have come through this circuit. Each one of those cases which have come before this court, neither dealt with physical contact, which both the court in Cain as well as the court in Nexion, both very clearly stated in each opinion this case does not deal with physical contact of a sexual nature by the residents. In each one of those cases, however, they both dealt with repeated sexual harassment statements which were, in fact, in Nexion they said the statements were clearly derogatory and demeaning, but there was no physical contact to go with it. Now, in this case, as was testified to by all the nurses who worked in the nursing home, including the appellant, Ms. Gardner, J.S., the resident, was physically and verbally abusive when it came to sexual harassment. One of the nursing home nurses described him, I guess, as hypersexual is the way that he was, for a period of two to three years, which also predated the time that Ms. Gardner began working with him. So for two to three years, you've got nurses who are complaining on sometimes a daily basis and in some instances a weekly basis of a resident who is sexually abusing them both verbally and physically. Every nurse who testified, and I believe there were six or seven nurses who we deposed in each one of their testimonies in the record, testified that this resident would grab their breasts, their rear ends, their private areas. He would ask for sexual favors. He would grab their, in some instances with Ms. Gardner, he even grabbed her back of her head one time while she was doing something, attempted to move it towards his crotch area. They all complained about these things. Ms. Gardner even testified. Complained to whom? I mean, they were in the daily write-ups? They were in the daily write-ups as well as they would go to both their supervisors, who would be the registered nurses. These are mostly CNAs. Their supervisor would be the registered nurse and then the assistant director and the director of nursing. Ms. Gardner testified that she even went directly to Ms. Brandy Gregg, and especially one time she had to deal with catheter care for this resident. Obviously, he's hypersexual, so catheter care is an issue with him. She complained about having to do it. They weren't doing anything to prevent the way he was. And Ms. Gardner testified that Ms. Gregg laughed about it, saying, well, you've just got to do it. And she laughed about the fact that this woman was having to subject herself to this individual who was demeaning physically and verbally abusing these women. In fact, some of the other nurses also testified that when they would complain to Terry Reynolds, who was the administrator, so the top of the chain, they were told, it's your job, you have to do it. They were told to put their big girl panties on and go do it. It was a quote from, I believe, at least one of the nurses, perhaps two of them, and it's in the record. So we're not talking about just some isolated, occasional, inappropriate comments. We're talking about two to three years' worth of verbal and physical abuse by this one resident without any intervention. And that's another key issue here, which other circuits, the Ninth, be sure I give you the right circuits, I know the Ninth is one, the Tenth as well, they both looked at similar situations where the nurse home actually did do things to intervene, actually put in behavior plans, actually gave additional training to their nurses to deal with residents who in one case, the Crist case, which was an Eighth Circuit case, the court actually held that they even tried to intervene in that case, but that the level of intervention was inappropriate such that summary judgment was inappropriate, such that the case must proceed to a jury to determine if the environment was hostile and abusive to such an extent that Title VII imposed liability. And so essentially what we're asking here is just that based upon the facts in the summary judgment, this is a jury issue. This wasn't something that a judge could find, well, this really wasn't hostile. Yeah, you work in a nursing home, but there has to be a line somewhere. And our belief and what we believe the court should hold is that that bright line rule is simply physical contact coupled with repeated verbal harassment is where that line is. Physical contact is the line, which was clearly crossed in this case through months and months of physical contact. Because again, we're not talking about an isolated incident, which is if you look at the district court's opinion as well as the defendant's briefs, they kind of focus on one incident which occurred the last day of Ms. Gardner's work, in which case it's undisputed, I believe, that J.S. was asking Ms. Gardner to perform sexual acts and berating her when she refused to let him grope her. And that led to him assaulting her. She was sent out on worker's compensation leave for several months and wasn't even able to work. And what's probably most egregious, I believe, is the fact that that's not even the reason he was sent out to a different nursing home. He was not even removed from the facility until he assaulted a resident at the nursing home. So his assault on Ms. Gardner and the undisputed fact that he was sexually berating and assaulting her during this encounter wasn't even the reason they removed him from the facility. It was the fact that he harmed a resident later in that same day, or maybe the next day, but in close proximity there, too. What's your best evidence of the physical contact before the day in question when there's the assault that leads to her? Seven different nurses testifying that it's gone on, including Ms. Gardner, on a nearly daily basis for the past two to three years. I've looked at a lot of that. It's fairly vague. What's the best specific evidence? I mean, I see some of them say it was a continuous problem of verbal and physical. But what's the most specific evidence you can point to that really describes the scoping or anything else like that? The most specific would be the day of the incident, which ended it all. Right. But I'm saying of before then. Prior to that, it's just all the nurses testifying on a daily basis, he grabbed the wrist intentionally, not a random grazing just when you're picking somebody up. And several nurses all testified to the same thing. He would intentionally grab their buttocks or grab their private areas, things of that nature. Now, none of them would sit there and describe the scene as it took place because it happened so often. Your Honor, we didn't go into. We'll give you a specific. They said it happened at least weekly, if not a daily basis, for these CNAs where he was constantly grabbing them, and they would constantly complain about it. They were told, just write them up. Put it in your daily notes. We'll do something about it. But that never happened. They put it in the notes, and it would be forgotten until it happened the next day. And it continued for a very long period of time. So what should the employer have to do? Because really, a hostile work environment claim is ultimately about the employer's failure to remedy once it knows problems are going on. What should they have done? Send him to this different facility? Or aside from that, what should they have done? Well, there would be several. Well, you look at his record. I mean, he has severe medical issues. That's correct, Your Honor. And in the other cases from the other circuits, those patients, too, had severe medical issues. And the question here isn't because nothing was done, Your Honor, so we don't get to judge what should have been done. Something should have been done, whether it was simply, in this case, we believe just simply transferring, allowing Ms. Gardner to not work with him because the evidence  redirect him better than Ms. Gardner was. So when we get to the direct evidence of the retaliation discrimination, that's kind of where Ms. Gardner... Were there any male nurses working there? No, Your Honor. There was no male nurses. One of our contentions is or would be anyway in a jury setting would be that they could easily just hire a male nurse. But, of course, I'm sure there's some rebuttal for that from them as well. But there were female nurses who were able to better handle him. Yes, he may grab them, but he wouldn't punch them if they said no. But for whatever reason, Ms. Gardner wasn't as fortunate. So when we get to the... Of course, the district court said we were unable to provide direct evidence of the retaliation discrimination based upon her gender. But what the... And that's where these two... It does. I mean, that's the difficulty with these cases. I mean, if this were an employee, you have a slam dunk case for sexual harassment. I mean, there's no question about it if this were another employee doing this or a supervisor. But it is... I mean, the nursing home has this obligation to care for this person who's got, you know, dementia, severe medical issues. It also, obviously, has an obligation to protect its employees and make sure they're not in a hostile environment. So it's just finding that balance in this area is difficult because it's... You see competing demands on the nursing home operator. And I agree with you, Your Honor. And that's the issue here is the fact they did nothing to try to stem the tide to protect Ms. Gardner or the other employees, just telling them, one, laughing about catheter care, which at the very least, something could have been done. At least not laughing at Ms. Gardner when she complained about it. Some sort of intervention, I think the only form of intervention involved a registered nurse, and all they did was say, well, let's give him some medicine to sedate him. That doesn't change the circumstance. That may knock him out for a little while while the white nurse is able to handle him, but that was Ms. Judy Tosh, T-O-C-H-E. She was told to give him some sedatives. That's not intervention. There's only one instance that I'm aware of in which that even took place. But what happened is Ms. Gardner asked to be removed from the situation, which Ms. Brandy Gregg also testified is the appropriate response to this type of situation. And ultimately what happened was Ms. Gardner was terminated. Now, the nursing home caused insubordination for refusing to treat Mr. J.S. But, however, the Supreme Court has long held as far back as the mid-'80s, if not before, that it is a violation of Title VII to require people to work in a discriminatorily hostile or abusive environment, going back to Meritor Savings Bank v. Vinson, 477 U.S. 57. Did she ask to be reassigned away from this patient before the big incident that led to her getting workers' comp? She had complained multiple times about him. I can't tell you, Your Honor, that she had asked not to treat him specifically. I didn't see anything in the record. I was just curious if I was missing something. But this was sort of the straw that broke the camel's back, is whenever she refused his sexual advances again and he sent her to the hospital. So at that point, Ms. Gardner was essentially to the point, I can't handle him, other nurses can, let them treat him, and they fired her for it. The law is very clear. You cannot force someone to work in that type of environment. So it was retaliation when the nursing home said, Ms. Gardner, you're fired. You're not going to deal with this patient. Yeah, we know he's abusing you, but you're not treating him, so you're fired. Do you have to show the hostile work environment was created before that day in question? Because after that day she went out on workers' comp and then she never, well, they fired her, but she never had to endure dealing with him again because he was also removed to the other hospital. So since you have that element of the employer refusing to do something, doesn't that have to be in response to this earlier harassment you're discussing? Well, they had refused to do something for months and years before. But, however, the law says one instance is enough if it's severe and egregious enough to hold an employer liable. But we don't have to worry about that because we've got months and years' worth of physical contact now. And when you look at the other circuits, the cases that we cite too, they all seem to have a moment where, again, the straw that broke the camel's back, such as in the Crist Court from the Eighth Circuit, where there was an incident where the resident finally ripped open a woman's shirt, pressed his erect penis up against the woman's bare stomach, and that was the straw that broke the camel's back. But there had been, just like in this case, plenty of evidence prior to that the nursing home was aware of what was going on and was simply doing nothing to stop it. Except in the Crist Court, there had been a plan put in place and some training for that resident, but it was held to be wholly insufficient. But, again, we don't even get to that point because there was no intervention, no training for these nurses. And another- What's the relevance of the fact that she allegedly took a swing at him? Well, the relevance of that is, number one, when we get to the pretext arguments, that's not in any of the termination documents that that had anything to do with it. The alleged swing was simply when he was punching her, and as it's explained, and they show it in their depositions, when they're punching her in the chest, her hand goes over his head. I don't think there's any evidence of a clenched fist or anything of that nature. And, again, even then, that just kind of gets us to a fact issue of pretext. Was it an issue of her swinging over his head? Because that's never mentioned by the person who did the termination. And since you bring that up, Your Honor, I want to point to the fact that Brandy Gregg, the person who offers that testimony, offers that testimony having never even looked at the termination documents before her deposition. The termination in this case, and this is why when we get to the pretext- But the document that fired her says one of the code of conduct violations was violation of resident's rights. Why wouldn't that encompass the swing, attempted swing? Because Ms. Reynolds, there are options. Violation of resident's rights, there are options for assaulting a resident or, if I have it handy- But she apparently didn't actually assault him. She just tried to. Right, she didn't. She may have swung over his head while she's being assaulted. And, again, we get back to, again, that's just her refusing his sexual advances and just simply swinging her arm over his head, whether that amounts to anything or not, is really a jury question. Because the person who says, well, it had something to do with her swinging over his head. Well, Ms. Gregg, the person who provides that testimony, had nothing to do with the termination. She had nothing to do with anything after the day of the incident. In fact, in her testimony, she goes through and she says the reason that Ms. Gardner was fired was because she was refusing patient care. And then towards the end of her testimony, she goes- She did say she had something to do with the suspension. Well, she says something about Ms. Gardner being suspended, but there's no documents about that. And I asked her about that in her deposition, which is in the record. Are there any documents saying that she's being suspended? She said, no, that's just in my notes, her notes. Ms. Terry Reynolds, the person who was the administrator who handed all this, didn't make notes about a suspension. Ms. Gardner was out on workers' compensation leave during this time period. So you've got all this testimony from a person who, yes, there is a presumption that because she's the director of nursing, she knows the facts, but she rebutted those facts herself when she got to the deposition, hadn't even looked at the termination documents at that time. She wasn't involved with the decision to terminate, but yet the court had just accepted her testimony on the grounds, which ultimately, based upon her testimony and the conflicting documents, we believe is a jury question, Your Honor. Okay. You'll have some time on her, but- Thank you, Your Honor. Mr. Dillard. Good morning. May it please the Court, my name is Brad Dillard. I'm here on behalf of CLC of Pascagoula. The facts are fairly uncontroverted and are laid out in the briefs. The central issue in this case is whether or not CLC of Pascagoula may be held liable for the actions of a physically disabled, mentally impaired and diseased elderly individual who is not able to control his actions or care for his own needs. I submit that it does not under the facts of this case. The answer to that question, maybe sometimes it can. I agree with this Honorable Court. There apparently is no bright line test in regard to this type of scenario, which is an unfortunate, albeit probably not unusual, scenario in the long-term care setting where an individual like J.S. who cannot control his own actions, who cannot conform to societal norms, but yet is unable, totally unable to care for himself. How do you control an individual like that? What happened at the end was they moved him to another facility. The question, I guess, is, in terms of the management of the facility that he was in that we're talking about, is that the right facility for the person? Apparently not is the answer. And at the end of the day, they moved him. So in terms of the management of the nursing home, they had a patient that they figured out maybe later than they should have shouldn't be there. And in the meantime, all this stuff happened. Your Honor, I believe the record reflects they figured that out after he had physically assaulted Ms. Gardner, which had not ever occurred prior to this. He also physically assaulted that same day another resident. At that point, Mr. J.S. became clearly a threat to employees and other residents, and the facility promptly took steps to have him sent out for a psych evaluation and then transferred to a lockdown facility. Up to that point, he had never exhibited, he had never physically harmed Ms. Gardner. He had never punched her. What about all the groping that was alleged before then? Yes, Your Honor. Now, there is testimony in regard to attempts to grope. There is testimony in regard to verbal inappropriate sexual statements that he made, not only to Ms. Gardner but to others. There's also testimony from all of these employees that that activity, again, is not uncommon in a nursing home setting when you're dealing with elderly, impaired individuals who, again, cannot understand the nature of their actions. That is something, even Ms. Gardner. The evidence is that he was by far the worst. I mean, was there anyone even comparable in this nursing home? Well, there's testimony from one of the nurses, Ms. Tosh, that indicated that he was no worse than other individuals who were sexually aggressive. There was testimony from other nurses that he was more sexually aggressive than other individuals. Ms. Gardner testified at length regarding her prior employment at other nursing homes. She admitted that she had encountered numerous other sexually aggressive individuals like Mr. J.S., that she had been trained on how to deal with them, that part of that training involves removing yourself from the situation until it calms down, getting assistance with the patient, as she did on October 6, 2014, and notifying the management. Now, she did all that. She also indicated that knowledge of a resident's propensities to engage in sexually aggressive activity would allow her to prepare herself to deal with that through being more standoffish when performing activities of daily life or in bringing assistance with her. In this particular case, she testified that when she started working at CLC in 2012, Mr. J.S. was a resident in the building. However, she was not caring for him. She was aware during that time period that he had an apparent propensity to be sexually aggressive. So before she began taking care of J.S., she knew of this propensity, which she indicated was important to her, and she knew how to deal with that. She had received training. Again, unfortunately, this is just not an uncommon scenario in the long-term care industry. What would be enough, in your mind, to create a fact issue on hostile work environment? If this doesn't get there, what more would it take? Your Honor, I answer that. I'm not trying to evade the question, but I answer it in the context of Cain and Nexion and then the other non-Fifth Circuit cases that we've looked at. In Cain and Nexion, I think it was very important that those residents were both physically and mentally disabled like J.S. In the other, the non-Fifth Circuit cases that we've looked at, the Turnbull case, the Christ case, the Aguiar case, those cases involved individuals who were not physically disabled, who were able to physically attack an individual. For instance, in the Christ case, I believe that's an Eighth Circuit case, this individual, the assailant was 16 years old. I believe the testimony of the facts were he was 6 feet tall, over 200 pounds. That's the case that Mr. Wade referenced a moment ago where he physically pinned the plaintiff against the wall, raised her shirt, pressed himself against her, committed a number of acts that in our case J.S. did not and was not physically able to do. In the Turnbull case, that involved a case where the plaintiff was actually physically, sexually assaulted by the assailant who had a history of sexual assault. In the Aguiar case, that involved a situation, a nursing home resident, where although the resident had some physical disabilities, he was able to amulate, walk around the facility, and had no mental impairment. That individual also had a history of domestic abuse and was facing criminal charges because of that abuse. And when you look at all those factors and apply those to our case, J.S., there's no history that we're aware of of criminal matters involving sexual abuse or domestic abuse. He was completely physically and mentally disabled, unlike the assailants in the non-Fifth Circuit cases. In fact, he suffered from dementia and psychosis, Parkinson's disease, chronic urinary tract infections, which Ms. Gregg, the D.O.N., testified would only increase aggression and anxiety. He had a total inability to ambulate. He was incontinent. He had traumatic brain injury from a motor vehicle accident and was diagnosed with a personality disorder. This was an elderly, physically disabled, mentally impaired individual, like the individuals in Cain and Exxon, who, again, could not control his own actions. How old was he? Your Honor, I don't have his exact age. We redacted that information out of his records, but it's my understanding he was in his early 70s, which is not elderly, but compared, but taken in connection with the physical disabilities and the mental impairments, it created a very difficult situation for CLC and any other nursing home. Yeah, I don't understand why. I mean, he had been there long enough that all the information you have given us, they had. They knew all that. So what's driving the nursing home to try to keep him there? Is it the economics or what? I mean, why was he still there? Your Honor, I think part of the answer to that is where else is he going to go? He's going to be transferred. He's going to go to a lockdown facility is what's going to happen. After he physically assaulted Ms. Gardner and another resident, when he was engaged in making the sexual-type comments and the activities that have been described, which, again, are not uncommon in this setting, there's no indication in the record that he would have been appropriate for a lockdown setting. He had been sent out to the local hospital on numerous occasions for psych evaluations and also for a determination as to whether or not he was suffering from UTIs, which, again, increased his aggression and his anxiety. Those were clearly interventions that had been taken by the facility. Mr. Wade stated there were. . . Why do you think the striking is so much worse than the repeated groping of private parts? Your Honor, I don't minimize Ms. Gardner's testimony about what was going on. Well, and others. I don't discount that. And whether you discount it or not, we have to assume it's true for purposes of summary judgment. Correct, Your Honor. You might be able to prove at trial she's completely full of it, but we have to assume it's true. Correct, Your Honor. I think in this particular case, again, given these facts, with this type of individual who, again, cannot apparently appreciate that what he is doing is inappropriate, who has been redirected on a number of occasions. And, again, I think it goes back to what can the facility do with this individual? He would be redirected. He would be distracted with a cookie and Kool-Aid. When Ms. Gardner complained, the director of nursing, Ms. Gregg, would go in the room and talk to him. There was a reference by Mr. Wade to sedatives. I don't believe that was a practice because unless there's a physician's order for sedatives, those are not going to be administered. CLC is a non-restraint facility. There are just a limited number of things you can do. Now, Ms. Gardner did admit that her charge nurses, when she would complain to them, that several of them would go in the room and handle the situation if Mr. J.S. became sort of out of control. For instance, Lateria Bivens, who was one of the charge nurses over the plaintiff, would go into his room and deescalate the situation upon the request of Ms. Gardner. Rebecca Bolton, another charge nurse who was over Ms. Gardner, upon her request, would also go in J.S.'s room, deescalate the situation. Nurse Tammy Clark, quote, would go above and beyond, close quote, to redirect J.S. upon the request of Ms. Gardner. So the statement that the facility simply sat back and did nothing and laughed at any allegations or complaints made by Ms. Gardner is simply not true. It's not supported by the record. Now, whether the facility handled this to the satisfaction of Ms. Gardner, apparently not. That's why we're here. But the facility took reasonable steps to try and deescalate the situation, to redirect J.S., to send him to the hospital to determine if he had a urinary tract infection and to get a psych evaluation. The Federal Bill of Rights for nursing home patients was found at 42 CFR 483.12. You know, it makes it very difficult for a nursing home to discharge a resident. And to do that, there are specific reasons that a facility may discharge a resident who is receiving Medicare or Medicaid benefits, such as J.S. Most of them are. Pardon? All of them, which most or all of them are, so. Correct, Your Honor. Most, if not almost, in my experience, 99 percent of the residents in nursing are Medicaid or Medicare patients receiving Federal benefits. Some of the reasons that a person can be transferred out of a nursing home is fair to pay, if it's a private pay individual. If that resident becomes a threat, a physical threat or danger to the safety of others in the building, if the building is not able to provide him or her a level of care they need. And I'm not bringing up the Federal Bill of Rights to say that that is an absolute defense to the nursing home. However, it is a consideration in that if Mr. Wade says, well, the facility should have simply moved him to another building, they should have discharged him somewhere else. It's not as easy as that. There have to be specific reasons. There has to be notice because, according to the Federal Government, the nursing home is his home. He has a right to be there unless there's a reason not to be. Unfortunately, the activity exhibited by JS is not unexpected. It's not unexpected in a nursing home setting with individuals like him. And, again, looking at Ms. Gardner's history, there's no indication that she or anyone else at the facility was singled out by JS to be the subject of inappropriate sexual comments or groping or whatever it might be. Apparently, he did not discriminate in regard to the individuals that he would make such statements to. Now, that is a fact, I believe, in Crist, Aguera, and Turnbull, that apparently those individuals were singled out by the assailants in that case. Your position is she just did not have the right to refuse to care for this person further on the grounds that she couldn't handle him. She said some of the white nurses could, but he apparently acted differently toward her, more physical, more dangerous. Is that true? Mr. Wade indicated that. I do not believe, Your Honor, that that's what I saw by the record. That's what I gather from the briefs and everything I've read. He would act out with anyone, I believe, who was there. There was testimony from the witnesses that it didn't matter if you were black or white, that he would make comments to you and act inappropriately toward you. Now, the interesting part of this, I believe, is Ms. Gardner, based on her testimony, did not refuse to care for J.S. because of the groping or the attempted groping on that day. It was because he struck her. And her testimony, first of all, on page 210 of the record, was that on the day in question that he attempted to inappropriately touch her. She stopped him. He again attempted to touch her left breast, and she stopped him. At that point, he became agitated. She was struck. She left the room, came back in with, I believe, a Janice Watkins, another CNA. Again, Mr. J.S. began acting inappropriately toward Ms. Watkins. But her testimony on page 214 was that she asked not to be assigned to J.S. because he had hit her, not because he had attempted to sexually touch her in an inappropriate manner or made those comments to her. So the reason that she was terminated was, again, the failure to provide care to the resident. And there's nothing in the record that would indicate that there were sufficient other staff, that someone else could have easily been transferred to Mr. J.S. that day in question. But the reasons were insubordination, refusal to provide care to the resident, cursing in front of the resident, and also attempting to strike the resident. The cursing in front of the resident goes back to the patient's Bill of Rights, and that comes from the statement, the witness statement of Janice Watkins, the CNA in the room, who indicated that, upon being struck, that Ms. Gardner stated, quote, I'm not going to do shit else for him and left the room at that point. Also, Ms. Watkins indicated that, although this is a little bit different from her deposition testimony, her statement indicates that when Ms. Gardner threw up her hands, that she was angry and agitated, and she did it in a quick manner. Judy Tosh, the nurse who came in the room as well, stated that clearly the plaintiff was angry and that she, in fact, did brush the resident's hairline or head with her fist when she swung. Again, that was reported by Ms. Tosh to Ms. Gregg and Facility Administration in something, obviously, that has to be taken very seriously, a witness statement from an employee that Ms. Gardner had attempted to strike this patient. Again, information that she had cursed in front of the patient and had refused care and was insubordinate. Those were the reasons that Ms. Gardner was turned down. We have a dispute as to whether all that was within the personal knowledge of the witness. Ms. Gregg, the director of nursing. Correct. Yes, Your Honor, that's an issue that was raised by Mr. Wade. Ms. Gregg, Ms. Brandy Gregg, was the director of nursing for the facility during this time period. She was the individual who was ultimately responsible and who oversaw all nursing care in the building, including the care of the CNAs. She testified that she was involved in the investigation, that she had reviewed the witness statements of Janice Watkins and Judy Tosh, and that she was familiar with what had occurred. She was not in the room on the day in question, but she did review and relied upon the statements of the individuals who were in the room as to what had occurred. And you're relying on her statement about what occurred when she was not in the room, is that right? Not only her statement, but also the statements of Judy Tosh, the nurse, and the written statement of Janice Watkins, the CNA, who were in the room when Mr. J.S. punched Ms. Gardner, and who both of them gave statements as to what occurred, such as Ms. Gardner cursing in front of the resident, Ms. Gardner throwing up her hands and brushing his hairline, brushing the top of his head. Those are the witness statements from the people who were in the room with personal knowledge. Ms. Gregg testified that she reviewed those and considered those part of her investigation as to what had occurred. Why did they wait to fire her until she came back from workers' comp? I mean, I see the document says her separation was held pending her completion of workers' comp. I mean, if she was insubordinate, why not fire her right then when she was insubordinate, I mean, after the investigation concluded? I agree, Your Honor. It's exactly what I would have recommended had they asked me. But for whatever reason, they allowed her to complete her workers' comp stay and then came back and terminated her at that point in time. Your Honors, I have limited time left. I don't believe there's necessarily a bright-line test that can be created for this type of scenario. I would agree with the lower court that when you're looking at a situation with a patient such as J.S. who is mentally and physically impaired, who cannot understand what is going on, who is totally dependent upon CNAs such as Ms. Gardner for everything from brushing his teeth to cleaning him after he is incontinent, that that is a unique situation. The fact that she was a CNA was a vital consideration in Kane and Nexium. I think it's a vital consideration here. We would ask the Court to affirm the lower court's decision. Thank you. Mr. Wade. Thank you, Your Honors. There are a couple of things to touch on as far as J.S.'s past, which was raised by opposing counsel. And I believe it's in the record, but I'm going to have to check because obviously there are several depositions and I can't recall off the top of my head what all was put in the record. But there was deposition testimony, I believe it's in the record, regarding J.S.'s past, where he had previously broken the former director of nursing's hand by pulling her fingers back so far that they broke. There's also another resident before the last resident who was the day that J.S. attacked Ms. Gardner and then attacked another resident. He had attacked a resident in the nursing home before. So to say there's no evidence of prior assaults or incidents like this is just not accurate. There were. Barbara Porter, the former director of nursing, had her hand broken by J.S. on a prior occasion. And I don't recall the facts of that circumstance, what was happening, but I do remember him breaking her hand in deposition testimony. Another thing I think is important to point out is also, as is in the record here, the facility that J.S. was sent to is a sister facility of the defendant's. It's not some random facility that he was sent to. He was sent to another facility owned and operated, this lockdown facility, which was actually owned by the same. I guess the impression I have, and it may not be accurate, the record may correct me. But just based on what opposing counsel has said, that this is a very regulated area. And the way the nursing home handles something like this is carefully regulated. So they, I mean, the nursing home is in a very difficult position vis-à-vis a patient like this. I mean, my question is, well, why not just ship him out of there? Well, the answer is, that is a lot harder to do than you seem to think, Judge. So this is a, I mean, from the standpoint of everybody involved in this case, it was a no-win situation. I mean. Well, as pointed out to you by opposing counsel, one of the grounds for the ability to remove a resident is physical abuse, things of that nature. But also, the argument that the Bill of Rights for a nursing home resident as a defense has been rejected by a district court in Massachusetts, already Lagenza, I think, is the name of the court. That was the argument raised there, and that court rejected arguing the Bill of Rights for a resident, simply saying that, yes, the resident has rights, but so do your employees. Oh, absolutely. That's right. I mean, everybody's got rights in this deal, okay? Everybody's got rights, and there's, I mean, and this is not, this is a common problem. Everybody's got rights, and we've got a common problem, and everybody's got a massive problem here. I mean, your client had a terrible problem. So did the nursing home, you know. Your Honor, our position on that is simply the nursing home had an easy fix. The record evidence, as far as Ms. Gardner testified to, is other nurses were able to better deal. For whatever reason, whatever the basis for J.S.'s or Greer's behavior towards Ms. Gardner, other nurses could use a cookie or Kool-Aid to redirect him, but for whatever reason, he didn't react to Ms. Gardner in the same fashion. Yes, this behavior is common, as testified to, unfortunately, by everyone, but J.S.'s behavior far exceeded that of the typical nursing home resident. The typical resident would do a passing grope or, you know, slide his hand across the buttocks of a nurse, but J.S., according to the nurses, it wasn't a graze. It was a flat-out, I'm going to grab you if you tell me no. I'm getting aggressive. The typical resident wouldn't berate you or verbally attack you if you said no. You know, they'd just go on with their day, but J.S. was not that way. And another thing, I believe that Ms. Gardner's prior training from other facilities that she didn't receive from the defendant, by the way, is more evidence of how egregious this was. Her prior training, she never had this issue before, but when she got here with J.S. after years, all of a sudden his actions were so bad that it was beyond the bounds of reason. Thank you, Your Honor. Thank you.